1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                          ----oo0oo----

11

12  PROVEN METHODS SEMINARS, LLC, a
    Nevada limited liability
13  company; and PROVEN METHODS
    CUSTOMER SERVICE, LLC, a Nevada
14  limited liability company, doing
    business together as NATIONAL
15  GRANTS CONFERENCES,
                                            NO. CIV. S-07-01588 WBS EFB
16          Plaintiffs,
                                            ORDER RE: MOTION FOR
17      v.                                  PRELIMINARY INJUNCTION

18  AMERICAN GRANTS & AFFORDABLE
    HOUSING INSTITUTE, LLC, a Texas
19  limited liability company; BEST
    NEWS REALTY, LLC, a Texas
20  limited liability company;
    COAST-TO-COAST MARKETING, LLC, a
21  Texas limited liability company;
    JOHN T. POLK; PATRICK FARAH;
22  WILLIAM PAPPAS, KALEB FORREST;
    RENE GONZALEZ; MICHELLE HARMON;
23  LEWIS CURRY; TIFFANY BARNES;
    SCOTT VOELKEL; STEVE WYMAN;
24  STEVE WOLLASTON; GUS FERNANDEZ;
    DONALD HARKEMA; NANCY DEVAUGHN;
25  JACK MARLANDO; DAWN LANE; and
    BRUCE WEST, JR.,
26
            Defendants.
27

28

                                1

1                        ----ooOoo----

2          Plaintiffs Proven Methods Seminars, LLC, and Proven

3    Methods Customer Service, LLC, (collectively "plaintiffs")

4    brought this action alleging copyright and trademark infringement

5    against defendants American Grants & Affordable Housing Institute

6    ("defendants").  Plaintiffs now move for a preliminary injunction

7    against defendants' continued use of the allegedly infringing

8    materials and mark.

9    I.   <u>Factual and Procedural Background</u>

10          In March of 1998, plaintiffs created a nationwide

11   program that provides information to its customers about the

12   various government grant, loan, and subsidy programs available to

13   buy their first home, invest in real estate, or start/expand

14   businesses.  (Orlando Decl. ¶¶ 1-3.)  Plaintiffs use "National

15   Grants Conferences" as its trade name and service mark, promoting

16   its program under that mark, including on its website

17   ("www.nationalgrants.com").  (<u>Id.</u> ¶¶ 4-5.)  Further program

18   promotion is conducted in markets across the country via a series

19   of free two-hour introductory seminars.  (<u>Id.</u>)  Following each

20   seminar, plaintiffs offer for sale the program's membership

21   package, i.e. a series of products and services that includes

22   extensive reference materials covering current assistance

23   programs offered by local and federal governments.  (<u>Id.</u>)

24          Defendants, formed in May of 2007, are also involved in

25   providing customers with information about how to obtain loans,

26   grants, and subsidies from government agencies.  (West Decl. ¶

27   2.)  Defendants actively promote their own business under the

28   corporate heading, "American Grants & Affordable Housing

                              2

Institute," and conduct information seminars across the country.
(Id.)  Like plaintiffs' business model, defendants follow these
seminars with a sales pitch aimed at increasing its consumer base
and selling various products and customer support services.
(Orlando Decl. ¶ 20.)

On August 3, 2007, plaintiffs filed this action based
on similarities regarding the companies' seminars and services,
as well as defendants' use of the "American Grants & Affordable
Housing" mark.[1]  Specifically, the complaint alleges eleven
causes of action: 1) copyright infringement (17 U.S.C. § 101 et
seq.); 2) trademark infringement (15 U.S.C. § 1114 et seq.); 3)
unfair competition/false advertising (15 U.S.C. § 1125(a)(1)); 4)
unfair competition/likelihood of confusion (15 U.S.C. §
1125(a)(1)); 5) intentional interference with contractual
relations; 6) intentional interference with prospective economic
advantage; 7) conversion; 8) theft of trade secrets; 9) unfair
competition (Cal. Bus. & Prof. Code § 17200 et seq.); 10) breach
of contract; and 11) conspiracy and aiding and abetting.
Plaintiffs now ask this court to enjoin Defendants from any and
all continued use of any plaintiffs'copyrighted material and the
"American Grants & Affordable Housing Institute" mark.

II.  Discussion

The legal principles applicable to a request for
preliminary injunctive relief are well established.  "To obtain a
preliminary injunction, the moving party must demonstrate either

---

[1]     Plaintiffs submitted an amended complaint on September
12, 2007 in which they contend that their copyright materials
were properly registered.  In all other respects, the amended
complaint is virtually identical to the original.

(1) probable success on the merits and the possibility of
irreparable injury, or (2) that serious questions are raised and
the balance of hardships sharply favors the moving party.  These
are not separate tests, but are the ends of a continuum; the
greater the relative hardship to the moving party, the less
probability of success must be shown."  Nat'l Ctr. for Immigrants
Rights, Inc. v. I.N.S., 743 F.2d 1365, 1369 (9th Cir. 1984)
(internal citations omitted).

        In the context of copyright and trademark claims,
however, the Ninth Circuit has recognized a broad presumption
that irreparable harm exists if a plaintiff is able to
demonstrate a likelihood of success on the merits.  Sun
Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th
Cir. 1999) ("Under federal copyright law ... a plaintiff that
demonstrates a likelihood of success on the merits of a copyright
infringement claim is entitled to a presumption of irreparable
harm."); Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174
F.3d 1036, 1066 (9th Cir. 1999) (noting that in trademark law,
"irreparable injury may be presumed from a showing of likelihood
of success on the merits of a trademark infringement claim")
(citing Metro Pub., Ltd. v. San Jose Mercury News, 987 F.2d 637,
640 (9th Cir. 1993)).  Thus, both the copyright and trademark
inquiries each effectively conflate the two prongs "into a single
question of whether the plaintiff is able to show a likelihood of
success on the merits." GoTo.com, Inc. v. Walt Disney Co., 202
F.3d 1199, 1205 n.4 (9th Cir. 2000) (referencing trademarks); see
also Micro Star v. Formgen Inc., 154 F.3d 1107, 1109 (stating
that party seeking preliminary injunctive relief on the basis of

4

copyright infringement need only show a likelihood of success on the merits).

A.   Copyright Claims

1.   Jurisdiction

Before considering the likelihood that plaintiffs will succeed on the merits of their copyright infringement claim, the court must determine whether it has subject matter jurisdiction over the claim.  Section 411 of the Copyright Act of 1976 provides that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).  See Dielsi v. Falk, 916 F. Supp. 985, 994 (C.D. Cal. 1996) ("Plaintiff's failure to plead that he has applied for a copyright registration deprives this court of subject matter jurisdiction over his copyright claim"); Conan Props. v. Mattel, Inc., 601 F. Supp. 1179, 1182 (S.D.N.Y. 1984) ("In order to proceed in its copyright infringement action, plaintiff is required to comply with the statutory requirement that all copyrights be registered").

In its initial complaint, plaintiffs failed to plead that registration or even pre-registration of their copyrights in the contested materials had occurred.  After the oversight was brought to their attention, plaintiffs immediately filed applications, deposits, and fees for the copyrighted material with the U.S. Copyright Office.  When the Copyright Office issued the registration certificates on September 10, 2007, plaintiffs properly filed an amended complaint to reflect issuance of these

certificates.[2]   In <u>Zito v. Steeplechase Films</u>, Inc, 267 F. Supp
2d 1022 (N.D. Cal. 2003), the court held that submission of an
amended complaint will sufficiently redress any jurisdictional
qualm.   <u>Id.</u> At 1205 (holding that despite plaintiff's failure to
register his work with the Copyright Office <u>before</u> filing his
complaint, "dismissal is not called for since plaintiff cured
this defect by registering his copyrighted photograph and filing
an amended complaint").   Here, it follows that plaintiffs'
original failure to allege registration is cured by the amended
complaint, which now includes allegations that the copyrighted
works are in fact registered.[3]   <u>See id.</u>; <u>Demetriades v. Kaufmann</u>,
680 F. Supp. 658, 661 (S.D.N.Y. 1988) (confirming proper
jurisdictional basis upon plaintiff's submission of amended
complaint alleging issuance of a valid copyright certificate).
Accordingly, the court finds that plaintiffs have complied with
the 17 U.S.C. § 411(a)and the court has subject matter
jurisdiction.

---

[2]   "A party may amend the party's pleading once as a
matter of course at any time before a responsive pleading is
served." Fed. R. Civ. P. 15 (a).

[3]   Defendants rely on the Ninth Circuit's decision in
<u>Morongo Band of Mission Indians v. Cal. State Bd. of
Equalization</u>, 858 F.2d 1376 (9th Cir. 1988), a non-copyright case
where the court held that an interpleader would have federal
question jurisdiction only if it would have existed in a coercive
action by defendant.   <u>Id.</u> at 1385-86.   Because the defendant's
well-pleaded complaints all arose under state law and there was
no diversity of citizenship, the court found that the plaintiff
in the interpleader action could not force federal subject matter
jurisdiction by amending its complaint to include federal claims
that would not have been part of the defendant's well-pleaded
complaints.   <u>Id.</u>   In contrast, the instant action is both
grounded in federal claims and directly analogous to the
aforementioned copyright amendment cases recognizing
jurisdiction.

1          2.   Success on the Merits

2          To succeed on the merits of their copyright

3    infringement claim, plaintiffs must show (1) ownership of valid

4    copyrights in the allegedly infringed material, and (2) copying

5    of protected expression by defendants.   Triad Sys. Corp. v.

6    Southeastern Express Co., 64 F.3d 1330, 1335 (9th Cir. 1995).

7               a.   Ownership of Copyrights

8          A copyright registration certificate is prima facie

9    evidence of copyright ownership. See 17 U.S.C. § 410(c) ("In any

10   judicial proceedings the certificate of a registration made

11   before or within five years after first publication of the work

12   shall constitute prima facie evidence of the validity of the

13   copyright and of the facts stated in the certificate.").

14   Plaintiffs have presented copies of registration certificates

15   covering (1) "Cashing in on Government Grants, Loans, and

16   Subsidies," Volumes I and II (collectively, the "Brown Books");

17   (2) "The Complete Directory and Cross Reference to Federal, State

18   and Local Grants, Loans and Subsidies" (the "Red Books"); and (3)

19   Plaintiffs' one-page "'Summary of Services' for Members."  (First

20   Am. Compl. ¶ 1.)

21         Defendants do not dispute the copyright status of the

22   Red Books or the Summary of Services page, but maintain that the

23   proof of registration does not suffice in relation to the Brown

24   Books.  (Defs' Opp. at 9: 25-26)  Specifically, defendants point

25   out that the copyright notice in the Brown Books list "C-Right

26   Holdings, Inc." (CRH, Inc.) as holders of the copyright, id. at

27   9: 27-28, and that there is no evidence that CRH Inc. ever

28   transferred or assigned its rights to the works to plaintiffs.

                              7

1  <u>Id.</u> at 10: 7-8.  However, it is undisputed that CRH Inc. is a

2  common law general partnership and "alter ego" formed by the

3  principals of plaintiffs.  (Orlando Decl. ¶ 20 n.1.)  Moreover,

4  like the Red Books and Summary of Services page, the Brown Books'

5  actual copyright registration certificate is issued to

6  "Plaintiffs Seminars, LLC."  (Gross 2d Supp. Decl. Exhibit D.)

7       Defendants also note that the Brown Books' application

8  for copyright registration does not list the materials as

9  "work[s] made for hire."  (Defs' Opp. at 10: 21-23)  Therefore,

10  defendants reason, the Brown Books are actually owned by Deborah

11  Rice, assumed to be the original author, and not Plaintiffs.  <u>Id.</u>

12  at 10: 23-24; <u>cf.</u> <u>Cmty. for Creative Non-Violence v. Reid</u>, 490

13  U.S. 730, 737 (noting that if an author creates a "work-made-for-

14  hire," then it is assumed that the company or person that hired

15  the author to create the work owns the copyright instead).  In

16  response, plaintiffs assert this was a typographical error in the

17  application, and that Rice was a work-for-hire when she

18  purportedly authored the Brown Books.  (Gross 2d Supp Decl. ¶ 5.)

19       It is well-accepted that such an error of this ilk

20  should not invalidate copyright registration.  <u>See</u> <u>Cooling Sys. &</u>

21  <u>Flexibles v. Stuart Radiator</u>, 777 F.2d 485, 487 (9th Cir. 1985)

22  ("Absent fraud, 'a misstatement or clerical error in the

23  registration application . . . will not invalidate the copyright

24  nor render the registration certificate incapable of supporting

25  an infringement action.'") (quoting 2 M. Nimmer, <u>Nimmer on</u>

26  <u>Copyright</u> § 7.20, at 7-147 (1985)).  Moreover, it is undisputed

27  that Rice created the original Brown Books in her capacity as a

28  work-for-hire.  (Rice Decl. ¶ 1.)  For this reason alone, the

8

copyright in the Brown Books--like those of the Red Books and the
Summary of Services page--belongs to Plaintiffs.  See Real Estate
Data, Inc. v. Sidwell Co., 907 F.2d 770, 771 (7th Cir. 1990)
("Under the work for hire doctrine . . . the County, as the
employer of Sidwell, was presumed to be the owner of the
copyright with the burden on Sidwell to demonstrate a contrary
intention.").  Thus, plaintiffs are the proper owners of the
relevant copyrights.

                    b.   Copying of Protected Expression

          After providing proof of ownership, a claimant must
show (a) that its materials indeed possess protectable
expression, and (b) that the alleged infringer actually copied
this expression.  Data East USA, Inc. v. Epyx, Inc., 862 F.2d
204, 206 (9th Cir. 1988).  Copyright protection is available for
"original works of authorship fixed in any tangible medium of
expression, now known or later developed, from which they can be
perceived, reproduced, or otherwise communicated, either directly
or with the aid of a machine or device."  17 U.S.C. § 102(a).
Copyright protection does not, however, "extend to any idea,
procedure, process, system, method of operation, concept,
principle, or discovery . . .."  17 U.S.C. § 102(b).  Thus, the
originality requirement mandates that objective "facts" and
"ideas" are not copyrightable.  Feist Publ'ns, Inc. v. Rural Tel.
Serv. Co., 499 U.S. 340, 347 (1991); Roth Greeting Cards v.
United Card Co., 429 F.2d 1106, 1109-10 (9th Cir. 1970).
However, "factual compilations" may possess the requisite
originality because compilation authors typically choose which
facts to include, in what order to place them, and how to arrange

                                9

1  the collected data so that they may be used effectively by
2  readers.  Feist, 499 U.S. at 348.  If the selection and
3  arrangement of the facts are made independently by the compiler
4  and entail a minimal degree of creativity, they qualify for
5  copyright protection.  See id. ("[E]ven a directory that contains
6  absolutely no protectible written expression, only facts, meets
7  the constitutional minimum for copyright protection if it
8  features an original selection or arrangement.").

9          The first inquiry is whether any or all of plaintiffs'
10 works possess the minimum level of creativity necessary to
11 establish copyright protection.  The Brown Books are compilations
12 of facts and information taken from various websites and other
13 source material.  While much of the information represented in
14 the Brown Books is taken from the public domain, the Books
15 themselves portray this information in an intentionally
16 scaled-down manner.  Further, the material is combined with
17 opinions and suggestions that represent significant judgment,
18 discretion, and originality on the part of its author.  (Rice
19 Decl. ¶ 5.)  The final product is a user-friendly "How-To" guide
20 to navigating the various government programs.

21         Likewise, plaintiffs' Red Books are compilations of
22 facts, e.g. general organizational and contact information for
23 governmental programs available in certain geographic locales.
24 While the degree of originality is less here than with the Brown
25 Books--plaintiffs simply organize the Red Books according to a
26 top-down infrastructure that reflects the inherent makeup of the
27 grant and funding programs--its personnel nonetheless utilize
28 more-than-trivial discretion in deciding exactly what information

1   to include as well as how to arrange it within each tier.  (Stork

2   Decl. ¶ 10.; Orlando Decl. ¶ 23.)   Therefore, both the Brown

3   Books and the Red Books are afforded copyright protection.

4          However, plaintiffs have not provided significant

5   evidence of creativity to warrant protection for their Summary of

6   Services page.[4]   Indeed, the page is simply a garden-variety,

7   mechanical outline of its program.  See Matthew Bender & Co. v.

8   West Publishing Co., 158 F.3d 674, 683-89 (2d Cir. 1998) (holding

9   that enhancements such as shortening the form of titles,

10  capitalizing letters, providing subsequent case history and other

11  garden-variety additions are not copyrightable because they miss

12  the creative spark); Spilman v. Mosby-Yearbook, Inc., 115 F.

13  Supp. 2d 148, 154-55 (D. Mass. 2000) (finding that trivial

14  aesthetics such as a table of contents do not have sufficient

15  creativity to be protected under copyright law).

16         Second, in order to prove copying of their protected

17  expression, plaintiffs must establish that defendants "had

18  'access' to plaintiff[s'] work and that the two works are

19  'substantially similar.'"   Three Boys Music Corp. v. Bolton, 212

20  F.3d 477, 481 (9th Cir. 2000).  Because defendants admit they had

21  access to plaintiffs' works,[5] this court need only focus on the

22  similarities between the two parties' materials.

23

24         [4]    Plaintiffs choose not to sufficiently develop this
     argument; nor can they prove, inter alia, that defendants's own
25  "Summary of Member Services" page--which describes their own
     services differently and lists them in a distinct
26  order--sufficiently copies plaintiffs' page.

27         [5]    "[Defendants] do[] not deny that it had access to
     [p]laintiffs' materials and that those materials were taken into
28  consideration when [defendants] drafted its own materials."
     (Def.'s Mem. Opp. Prelim. Inj. 14: n.8)

                                    11

1   Copyright protection of factual compilations is "thin,"
2   and a subsequent compiler remains free to use the facts contained
3   in another's publication to aid in preparing a competing work so
4   long as the competing work does not feature the same selection
5   and arrangement.  Feist, 499 U.S. at 349.  In such cases,
6   plaintiffs must demonstrate "verbatim reproduction or very close
7   paraphrasing before a factual work will be deemed infringed."
8   Landsberg v. Scrabble Crossword Game Players, 736 F.2d 485, 488
9   (9th Cir. 1984) (alleged infringer's Scrabble game-strategy book
10  contained no more similarity than what must have been produced by
11  anyone wishing to restate the unprotectable ideas in plaintiff's
12  book).

13  After a comparison of plaintiffs' Brown Books with
14  defendants' analogous material, it is evident that defendants
15  have infringed on plaintiffs' copyright in the Brown Books.  The
16  Brown Books, more so than any of plaintiffs' submitted exhibits,
17  display ample amounts of creativity and originality.  Evidence
18  and research shows that its original author, Deborah Rice, took
19  public domain material and then thoroughly condensed and
20  rearranged it, all the while managing to insert inventive
21  goal-setting checklists as well as original, nuanced suggestions
22  for fledgling investors.  Even a cursory glance at both parties'
23  materials demonstrates that defendants substantially duplicate
24  Rice's selection and arrangement.  Defendants' material includes
25  substantial replication as well as "makes a very close
26  paraphrasing" of Rice's copyrighted expression.  Id.

27  In contrast, plaintiffs are unable to demonstrate that
28  defendants have infringed on the copyright in the Red Books.

12

1   This copyright relies wholly on selection and arrangement and is

2   void of additional originality.  Further, the creativity of the

3   Red Books selection and arrangement--which reflects the inherent

4   top-down infrastructure of the grant and funding programs--is

5   exceedingly minimal, entitling plaintiffs to only the thinnest of

6   copyright protection.  Unlike the Brown Books, where selection

7   and arrangement was enhanced by overt and idiosyncratic choices

8   that defendants could not have found in the public domain (yet

9   which appear in its materials nearly word-for-word), it is

10  undisputed that the structure of the Red Books aligns with facts

11  and ideas that emanate from the public domain.  Thus, absent any

12  wholesale or verbatim instances of copying in regards to

13  plaintiffs' explicit selection and arrangement, there is no

14  infringement of the Red Books.  <u>See</u> <u>Satava v. Lowry</u>, 323 F.3d

15  805, 812 (9th Cir. 2003) (noting that while plaintiff added some

16  original variations that can earn copyright protection, this

17  protection is "thin" and only allows plaintiff to "prevent others

18  from copying the original features he contributed").[6]

19          Because Plaintiffs have demonstrated a likelihood of

20  success on the merits as to infringement of the Brown Books,

21  irreparable harm is hereby presumed.  <u>Sun Microsystems</u>, 188 F.3d

22  at 1119.  With regard to the Red Books and Summary of Services

23  page, plaintiffs are unable to demonstrate a likelihood of

24  success on the merits.  Further, the court is not persuaded by

25  _____

26          [6]     Should a competing business decided to hire a marketing
    firm to research material in the public domain in order to put
27  together a directory of government grant and loan programs, it is
    inevitable that its directory would, in some capacity, mirror the
28  Red Books.  In fact, Defendants asserts they did exactly that
    when they put together its directory.  (Walter Decl. ¶ 2.)

1  plaintiffs' assertion of irreparable harm as it relates to the
2  latter materials.[7]  Accordingly, the court will grant plaintiffs'
3  motion in part and deny it in part.

4        B.   Trademark Claim

5             A successful trademark infringement claim requires a
6  showing that the claimant holds a protectable mark and that the
7  alleged infringer's imitating mark is similar enough to "cause
8  confusion, or to cause mistake, or to deceive."  KP Permanent
9  Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117,
10 (2004).  Plaintiffs claim that their trademark, "National Grants
11 Conferences," is infringed by Defendants' mark, "American Grants
12 & Affordable Housing."

13            1.   Protectable Mark

14            The purported trademark holder bears the ultimate
15 burden of proof as to trademark validity in an infringement
16 action.  Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc., 419
17 F.3d 925, 928 (9th Cir. 2005) (citing Tie Tech, Inc. v. Kinedyne
18 Corp., 296 F.3d 778, 783 (9th Cir. 2002)).  Federal registration
19 of a mark constitutes prima facie evidence of its validity, thus
20 serving as a burden shifting mechanism.  15 U.S.C. § 1057(b);
21 Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc., 198
22 F.3d 1143, 1146 (9th Cir. 1999).  Because it is undisputed that
23 plaintiffs hold a registered trademark in "National Grants
24 Conferences," the burden effectively shifts to defendants to
25 prove that the mark is invalid.  Defendants, in turn, contend

26

27        [7]    In fact, a balance of the hardships would decidedly
   favor defendants, a fledgling company that would be forced to
   cancel scheduled conferences and lose untold profit while
28 incurring ongoing liabilities.  (West Decl. ¶ 4.)

1   that the registered mark is generic and thus not accorded

2   protection.  A generic mark is one that refers, or has come to be

3   understood as referring, to the genus of which the particular

4   product or service is a species.  Surgicenters of America, Inc.

5   v. Medical Dental Surgeries Co., 601 F.2d 1011, 1014-15 (9th

6   Cir.1979).  A party seeking to void a registered trademark on

7   grounds that it is generic must overcome the presumption of

8   validity by a preponderance of the evidence.  Anti-Monopoly, Inc.

9   v. General Mills Fun Group, Inc., 684 F.2d 1316, 1319 (9th Cir.

10  1982).  If shown to be generic, such a mark cannot become a valid

11  trademark under any circumstances.  Id.  In determining whether a

12  mark in generic, the Ninth Circuit has often relied on the "who

13  are you--what are you" test, where a valid mark answers the

14  buyer's questions "Who are you? Where do you come from?" "Who

15  vouches for you?"  U.S. Jaycees v. San Francisco Jr. Chamber of

16  Commerce, 513 F.2d 1226, 1229 (9th Cir. 1975).  In contrast, a

17  generic name answers the question "What are you?" Id.

18       The "National Grants Conferences" program is an

19  interactive organization that includes not only seminars but also

20  provides its members with one-on-one consulting, reviews and

21  critiques of business plans and grant applications, website

22  access, a toll-free contact number, etc.  (Orlando Decl., ¶ 6.)

23  Moreover, the program's services do not focus exclusively on

24  federal grants but also state and local grant programs as well.

25  Thus, the name "National Grants Conferences" is not the generic

26  name for this category of goods and services, or for its

27  producer, but rather a mark that connotes a unique service that

28  plaintiffs supply their customers--i.e. "who" plaintiffs are.  In

1  fact, it is not difficult to imagine another term of reasonable

2  conciseness and clarity by which the public could refer to these

3  goods and services.  See Comm. for Idaho's High Desert, Inc. v.

4  Yost, 92 F.3d 814, 822 (9th Cir. 1996) (finding that "Committee

5  for Idaho's High Desert" was not generic where the name for the

6  genus to which its particular desert preservation services belong

7  would probably be "environmental education and advocacy").

8  Because defendants are unlikely to meet their burden by a

9  preponderance of the evidence, the court finds, for purposes of

10  this motion, that plaintiffs' mark is valid.

11           2.   Likelihood of Confusion

12           A likelihood of confusion exists "when consumers are

13  likely to assume that a product or service is associated with a

14  source other than its actual source because of similarities

15  between the two sources' marks or marketing techniques."

16  Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 604

17  (9th Cir. 1987).  In AMF Inc. v. Sleekcraft Boats, 599 F.2d 341

18  (9th Cir. 1979), the Ninth Circuit listed eight factors to be

19  considered as part of the consumer confusion inquiry.  Id. at

20  348-349.  The Sleekcraft factors are: (1) the similarity of the

21  marks; (2) the strength of the plaintiff's mark; (3) the

22  relatedness or proximity of the goods; (4) the marketing channels

23  used by each party; (5) the degree of care likely to be exercised

24  by the purchaser; (6) the defendant's intent in selecting the

25  mark; (7) evidence of actual confusion; and (8) the likelihood of

26  expansion of the parties product lines.  Id.  This list of

27  factors is not exhaustive--the test is a very pliant one,

28  depending on the circumstances of each specific case.  Id. at 348

16

n.11;   <u>Brookfield Communs. v. W. Coast Entm't Corp.</u>, 174 F.3d
1036, 1054 (9th Cir. 1999).

              a.   <u>Similarity of the Marks</u>

        "The first <u>Sleekcraft</u> factor--the similarity of the
marks--has always been considered a critical question in the
likelihood-of-confusion analysis." <u>GoTo.com</u>, 202 F.3d at 1205.
To determine the similarity of marks, "first the marks must be
considered in their entirety and as they appear in the
marketplace; second, similarity is adjudged in terms of
appearance, sound and meaning; and third, similarities weighed
more heavily than differences." <u>Id.</u> (citations omitted).

        Plaintiffs' mark appears in the marketplace as
"National Grants Conferences," while defendants use the mark
"American Grants & Affordable Housing Institute."  However,
plaintiffs focus only on the first two words of each party's mark
throughout its argument, continuously referring to its program
(and themselves, for that matter) as simply "National Grants" and
its adversary's mark as "American Grants."  The Ninth Circuit
dictates "that marks must be considered in their entirety." <u>Id.</u>
By trimming defendants's mark down from six words to two--not to
mention leaving off "Conferences" in connection with their own
mark--plaintiffs' argument ignores applicable precedent.
Further, plaintiffs arguments that defendants accentuate the
"American Grants" font/type in relation to the latter "&
Affordable Housing Institute" on selected materials or that a
speaker at one of defendants' events referred to the program as
"American Grants" lack merit.  In actuality, the truncated term
"American Grants" appears nowhere in any of the material that

plaintiffs have filed with the court; rather, the reference is always to "American Grants & Affordable Housing Institute" or its acronym, "AGAHI."

Plaintiffs also focus on the similarity between "National" and "American," asserting that they are confusingly similar because the "meaning" is identical. (Pl.'s Mem. Supp. Prelim. Inj. 17: 8-9)  As defendants point out, however, the terms "National" and "American" are commonly employed to differentiate programs or entities engaged in similar forums or business ventures.[8]  Thus, the very words that plaintiffs highlight have been instituted in efforts to help others differentiate one entity from another when both maintain similar functions in the very same market.

When viewed in their entirety, the marks are not sufficiently similar.

b.   Strength of the Mark

The strength of a mark is determined by its placement on a continuum of increasing distinctiveness: (1) generic (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). A generic mark is inherently the weakest and is not afforded protection; a merely descriptive mark specifically describes a characteristic or ingredient of an article or service and is protectable if it acquires a secondary meaning (i.e., becoming

---

[8]   A non-exhaustive list of examples includes the National Broadcasting Company (NBC) and the American Broadcasting Company (ABC) in television programming; the American League (AL) and the National League (NL) in Major League Baseball; and, during the mid-twentieth century, the American Football League (AFL) and the National Football League (NFL) in professional football.

1  distinctive of the applicant's goods);  a suggestive mark

2  suggests rather than describes an ingredient, quality, or

3  characteristic requiring imagination, thought, and perception to

4  determine the nature of the goods; and an arbitrary or fanciful

5  mark receives the strongest protection because it is usually a

6  word or words invented solely for use as a trademark.

7  <u>Surgicenters</u>, 601 F.2d at 1014-15.

8       Notwithstanding the court's conclusion that plaintiffs

9  indeed hold a valid trademark in "National Grants Conferencing,"

10 the mark is stationed on the weak side of the continuum.  The

11 mark either fits into the "suggestive" category because it

12 requires one to presume the nature of the program or services, or

13 possibly the "descriptive" category in that it references some of

14 the characteristics of plaintiffs' program that render it

15 distinctive.  Given plaintiffs' investment and goodwill/consumer

16 recognition, the former assessment is likely but still

17 underwhelming.  Accordingly, the strength of plaintiffs' mark is

18 average-to-weak.

19                 c.   <u>Proximity of the Goods</u>

20       Where the goods bearing the two marks at issue are

21 related, there is a concern that consumers will be confused as to

22 the producer of the goods.  <u>Official Airline Guides, Inc. v.</u>

23 <u>Goss</u>, 6 F.3d 1385, 1392 (9th Cir. 1993).  Here, it is undisputed

24 that the services provided by defendants are virtually identical

25 to those provided by plaintiffs.  Thus, this factor weighs in

26 favor of plaintiffs.

27                 d.   <u>Marketing Channels Used by Both Parties</u>

28

1      The Ninth Circuit has determined that "convergent

2 marketing channels increase the likelihood of confusion." <u>Id.</u> at

3 1393.  Plaintiffs argues that defendants schedule its seminars at

4 the very same venues and advertise through the same mediums as

5 plaintiffs.  Whether this is a result of malfeasance on

6 defendants' part or simply because the amount of

7 venues/advertising streams made available to companies that stage

8 informational seminars on government grants are limited is not

9 ascertainable at this juncture.  Thus, while it is possible that

10 defendants' location in the same marketing channels will confuse

11 consumers, it is also possible that the available booking areas

12 are so few and well-defined that there are no other alternatives.

13        e.  <u>Type of Goods and Degree of Care Exercised by</u>

14            <u>Consumer</u>

15      To determine whether there is a likelihood of

16 confusion, courts look to "the reasonably prudent purchaser

17 exercising ordinary caution." <u>Id.</u> at 1393.  Courts assume that

18 buyers will exercise greater care and sophistication in their

19 purchases when the goods are expensive. <u>E. & J. Gallo Winery v.</u>

20 <u>Gallo Cattle Co.</u>, 967 F.2d 1280, 1293 (9th Cir. 1992).  Given

21 that the price of plaintiffs' "National Grants Conferences"

22 workshop/membership costs anywhere from approximately $999.00 to

23 $1,900.00,[9] this court will assume that both parties' programs

24 are sufficiently costly to cause consumers to exercise a

25 moderately-high to sophisticated degree of care--thus lessen any

---

26

27     [9]   Information obtained from internet advertisement
website.  National Grants Conferences, ProgramReviewer.com,
28 http://www.programreviewer.com/nationalgrantsconferences.html
(last visited Sept. 17, 2007).

likelihood of confusion in making a purchase of the services in question.  <u>See</u> <u>Sleekcraft</u>, 599 F.2d at 353 (holding that expensive goods and sophisticated purchasers cut against a likelihood of confusion).

### f.   <u>Defendants' Intent in Selecting the Mark</u>

"[A]n intent to confuse consumers is not required for a finding of infringement." <u>Brookfield</u>, 174 F.3d at 1059. However, an intent to deceive is strong evidence of a likelihood of confusion.  <u>Sleekcraft</u>, 599 F.2d at 354.  Plaintiffs argue that defendants deliberately selected their name to confuse consumers and profit from the goodwill that plaintiffs have established over the past nine years.  Although defendants were undoubtedly aware of plaintiffs' mark, there is no evidence linking defendants to any intentional deception in the selection of its mark.  Moreover, because defendants' mark is not sufficiently similar to that of plaintiffs' mark so as to cause a likelihood of confusion all by itself, it is unlikely that defendants would deliberately choose such a mark to confuse consumers.

### g.   <u>Evidence of Actual Confusion</u>

Evidence of actual confusion is strong evidence that future confusion is likely, <u>Nutri/System</u>, 809 F.2d at 606, but the absence of such evidence is not dispositive.  <u>Eclipse Assoc., Ltd. v. Data General Corp.</u>, 894 F.2d 1114, 1118 (9th Cir. 1990).  Plaintiffs provide several purported instances of both vendor and consumer confusion.  However, most if not all of the vendor "confusion" is traceable to administrative error stemming from the presence of former plaintiffs' employees now situated with

21

1  defendants rather than perceived similarities of the respective

2  marks.   Likewise, plaintiffs fail to show that any professed

3  customer "confusion"--e.g., that a given customer believes he or

4  she may have attended one of defendants' seminars previously

5  despite it being defendants' first seminar in that area--is

6  attributable to the similarity of the parties' marks rather than

7  the more cognizable similarity in their overlapping function as

8  providers of governmental grant information.   Thus, plaintiffs

9  are unable to establish convincing evidence of actual confusion.

10                      h.   Likelihood of Expansion of the Parties'

11                           Product Lines

12            "Inasmuch as a trademark owner is afforded greater

13  protection against competing goods, a strong possibility that

14  either party may expand his business to compete with the other

15  will weigh in favor of fording that the present use is

16  infringing." Sleekcraft, 599 F.2d at 354 (citation omitted).

17  When goods are closely related, significant expansion is likely

18  to result in direct competition.   Though defendants' company is

19  admittedly in its infancy, neither party provides the court with

20  evidence of an intention to expand the product lines or programs

21  involved.   Thus, this factor is neutral.

22            Upon consideration of all the relevant factors,

23  plaintiffs have not sufficiently demonstrated a likelihood of

24  confusion.   Although some of the factors are either neutral or

25  weigh in plaintiffs' favor, the court finds that plaintiffs have

26  not made the most crucial showings specific to this case--that

27  the marks are confusingly similar, proof of intent in selecting

28  the mark, and a low degree of care exercised by consumers.   See

1   <u>Brookfield</u>, 174 F.3d at 1054 ("Some factors are more helpful than

2   others, and the relative importance of each individual factor

3   will be case specific."). Given these deficiencies, plaintiffs

4   have a stronger need to demonstrate evidence of actual confusion,

5   which they do not. Because the court finds that plaintiffs

6   cannot establish a likelihood of success on the merits of the

7   claim, the presumption that irreparable harm exists is rebutted.

8   Further, any harm that does exist is either negligible or favors

9   defendants. <u>See supra</u> n.6. Accordingly, the court will deny

10  plaintiffs' Motion for a Preliminary Injunction on its trademark

11  infringement claim.

12      C.    <u>Bond</u>

13          As a condition of issuing a preliminary injunction, the

14  court must require that the plaintiff post security in an amount

15  which the court deems proper. Fed. Rule Civ. Proc. 65(c).

16  Particularly in light of the amounts defendants have expended on

17  advertizing and other losses they can be expected to incur if

18  enjoined from conducting their upcoming scheduled seminars,

19  defendants suggest a bond in the range of $500,000 to $1,000,000

20  would be appropriate. Plaintiffs, on the other hand, argue that

21  many of the costs of planned seminars can be avoided by

22  cancellations, and suggest that a bond of $100,000 or less would

23  be appropriate.

24          Considering all of the facts presented, in light of the

25  fact that the court has not enjoined defendants from conducting

26  their seminars altogether, but only from using certain books, the

27  court finds that a reasonable sum to require plaintiffs to post

28  as bond would be $250,000.

1          IT IS THEREFORE ORDERED that:

2          (1) plaintiffs' motion for preliminary injunction on

3     its copyright claim with respect to the Brown Books be, and the

4     same hereby is, GRANTED;

5          (2) plaintiffs' motion for preliminary injunction on

6     its copyright claim with respect to the Red Books be, and the

7     same hereby is, DENIED;

8          (3) plaintiffs' motion for preliminary injunction on

9     its copyright claim with respect to the Summary of Services page

10    be, and the same hereby is, DENIED;

11         (4) plaintiffs' motion for preliminary injunction on

12    its trademark claim be, and the same hereby is, DENIED;

13         (5) upon the posting by plaintiffs of security in the

14    amount of $250,000, defendants and their officers, agents,

15    servants, employees, attorneys and those persons in active

16    concert or participation with them, shall not use, sell, or

17    market its counterpart material to plaintiffs' Brown Books; and

18         (6) this preliminary injunction shall take effect

19    immediately and shall remain in effect until otherwise ordered by

20    this court, or until final judgment is entered in this case.

21    DATED:   September 17, 2007

22

23                     WILLIAM B. SHUBB
                       UNITED STATES DISTRICT JUDGE
24

25

26

27

28

                                24